# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: | ) |
| | ) **Chapter 11** |
| JODY L. KEENER, | ) |
| | ) **Bankruptcy No. 14-01169** |
| Debtor. | ) |

## MEMORANDUM RE: CONFIRMATION OF PLAN, MOTION TO CONVERT, AND/OR MOTION TO APPOINT TRUSTEE

These matters came before the Court for hearing on November 10th, 12th, and 13th, 2015. Jeffrey Goetz, Krystal Mikkilineni, and Justin LaVan appeared for Debtor and Debtor in Possession Jodi Keener ("Keener"). Joe Peiffer and Abram Carls appeared for Creditor Super Wings International, Limited ("Super Wings"). The parties made closing arguments on November 30th. On December 7th, Keener filed an amendment to the plan and filed additional exhibits. On December 8th, Keener a brief on these issues and Super Wings, through its co-counsel, Eric Lam, filed a brief opposing Keener's motion to compromise—an issue related to plan confirmation. On December 17th, the Court entered an order on all of these issues and stated that it would be filing this memorandum setting forth the legal and factual basis for that order. These are core proceedings under 28 U.S.C. § 157(b)(2)(A) and (L).

## STATEMENT OF THE CASE

Keener seeks confirmation of his Third Amended Individual Chapter 11 Combined Plan of Reorganization and Disclosure Statement ("the plan").  Super Wings objects to confirmation of the plan and moves to convert the case to Chapter 7 or in the alternative to appoint a trustee.

Keener argues that the plan meets all the requirements for cramdown confirmation.  Super Wings argues, among other things, that the disclosure statement is inadequate, the plan was not proposed in good faith, and the plan is not feasible.  Super Wings also objects to its treatment under the plan.  Super Wings argues that the evidence it presented against confirmation also support its motion for conversion and alternative motion to appoint a trustee.

Because the Court finds that Keener has not met his burden to show that the plan is feasible, the Court denies confirmation of the plan.  While doing so, the Court will grant Super Wings' Motion for Summary Judgment on the Motion to Compromise.  The Court also denies Super Wings' motions to convert to Chapter 7 and to appoint a trustee.  The Court does however find that, on the evidence presented, appointment of an examiner may be appropriate.  The Court will set a separate hearing on this issue.

# PROPOSED PLAN AND BACKGROUND

## The Proposed Plan's Treatment of Super Wings

Keener proposed to treat Super Wings as a fully secured creditor under his Third Amended Plan.  Super Wings is the only objecting creditor.  In sum, Keener seeks to pay the class of creditors that includes Super Wings by a combination of methods.  Keener proposes to pay in $25,000 of his salary from one of his companies, Alpha International, Inc. ("Alpha") every quarter.  Keener proposes to pay in additional sums from the sale of inventory and equipment from his toy companies.  He also proposes the sale of various parcels of real estate at different points during the life of the plan.  All of this, Keener believes, will result in full payment of Super Wings.

Super Wings strongly disagrees that Keener has proposed a feasible, full-payment plan.  Super Wings points out that the only solid, identified payment is the quarterly $25,000 payment from Keener's salary.  These quarterly payments provide $100,000 yearly and thus $500,000 over the five year proposed life of the plan.  This is nowhere near full payment of Super Wings claim of more than $3,000,000.  Super Wings asserts that all of the remaining sources of payment are based on unreliable projections that make the plan not feasible.  Super Wings, in particular, emphasizes Keener's lack of trustworthiness, history of not paying creditors, and wildly inconsistent financial statements and records.

3

## FINDINGS OF FACT

This case involves the reorganization attempt of an individual, Debtor Jody

L. Keener.  Keener has been in the toy industry for the better part of his adult life.

Keener worked for a short period of time in the carnival industry.  During that

time, he developed an interest in the toy industry.  In 1969, he started K and K toy

novelty.  He has gradually accumulated toy inventory, large scale toy

manufacturing equipment, and intellectual property rights related to certain toy

brands.

Keener owns a number of well-known toy brand rights.  For example, he

owns what has been characterized as the second most famous toy brand, "Big

Wheels."   Keener's proposed plan of reorganization in this case deals primarily

with his ability to generate income and sale proceeds from his toy businesses.  He

intends to supplement the payments under the plan from sale of some of his

various real estate holdings.

Keener has also, over the years, gained significant commercial and

residential real estate holdings in Cedar Rapids, Iowa.  He has separated his toy

and real estate interest into a number of companies.  Keener is owner of 100% of

all these companies.   As noted in Keener's proposed plan and throughout the

testimony and documentary evidence offered in this case, there are eight separate

companies holding the various assets.  Three of the companies relate to toy

4

manufacturing and/or distribution.  Those companies are J. Lloyd International

Corp. ("J. Lloyd"), J. K. Manufacturing Co. ("J. K. Manufacturing"), and Alpha.

Three companies, Corner Stone, LLC, Jacob Wells, LLC, and J. K. Properties,

LLC ("Corner Stone," "Jacob Wells," and "J. K. Properties," respectively), are

described as single-asset real estate companies.  The other two companies,

Closeouts Unlimited, Inc. ("Closeouts Unlimited"), and Retro-Images, Inc.

("Retro-Images"), are described simply as retail sales and distribution companies,

respectively.

Keener's plan relies, in large part, on income and sales from Alpha.  This

has been described as his primary toy manufacturing and distributing company.

The salary from Alpha and toy equipment sales by Alpha will fund the majority of

the plan.  Keener also relies on the sale of parcels of real estate to make payments

necessary to fully fund the plan.  Whether the companies or Keener owned such

real estate is unclear from the record.

Super Wings highlighted important items from Keener's past to support its

objection.  Super Wings first pointed out the undisputed fact that in the 1990s

Keener experienced significant troubles with the Internal Revenue Service that

resulted in criminal charges.  Super Wings argues this goes to Keener's credibility

and to his record of inaccurate financial reporting over the years.

The second matter from the past deals with previous marriages. Keener has been married and divorced four times. The Court finds only one of those previous marriages to be of probative value here. Keener was married for over ten years to a woman now known as Connie Hung. She testified that she and Keener were married from 1992 through 2002. Her testimony goes to the same issues of Keener's credibility and his unreliable reporting.

The Court finds the following testimony from Hung to be particularly probative and relevant here. Hung testified that through the course of their marriage, she and Keener held and reported virtually all of their joint property in her name. Keener insisted on keeping things in her name to avoid reporting to the Internal Revenue Service and paying certain creditors. The real estate they purchased and owned together was always put in her name. More importantly, three of the companies Keener currently holds—Alpha, Closeouts Unlimited, and Jacob Wells—were owned 100% by her.

Hung provided detailed testimony about Alpha, because of its particular relevance to the funding of the plan in this case. In spite of her 100% ownership of Alpha during their marriage, Keener was "the mind" behind the company. Keener ran what could fairly be called as the entire "toy business" part of the Alpha operation. He did the inventory purchases, equipment transactions, and all other matters related to the toy manufacture, inventory, and intellectual property rights.

6

Keener also decided the contracts, accounts payable, and all other important business matters.  Hung described her role as more administrative.  She dealt with personnel, human resources, and other administrative functions.

Hung and Keener's relationship eventually fell apart.  They divorced in 2002.  Keener left Alpha at some point in early 2002.  He then started J. Lloyd, a toy manufacturing business meant to directly compete with Alpha and Hung. Keener worked hard against Hung during that period time.  He worked on harming her ability to obtain credit to effectively operate the company.  He was successful in the end.  When Alpha was no longer viable, Hung filed for bankruptcy.  In the bankruptcy, Keener purchased the three companies in her name, including Alpha, for pennies on the dollar.  Hung points out, and the record confirms, that Alpha had significant value tied up in its equipment and inventory.  Keener was able to buy it out from under her and leave her effectively with nothing.

Hung also testified that Keener ran several "side businesses."  The most significant of which dealt with Keener's buying and selling of precious metals and diamonds.  It was a significant second business and Keener had made significant money.  He never reported any of this business to the Internal Revenue Service or otherwise disclosed these transactions.  Keener also had significant gambling winnings which he never reported.

7

Hung also has a record of dishonesty and/or lack of credibility. During her bankruptcy, she admitted that she engaged in a number of activities that resulted in a denial of her discharge. She admitted readily to her misdeeds in the bankruptcy. In spite of this, the Court finds her testimony about Keener's financial practices related to the reporting and disclosure of assets to be credible. Keener did not dispute the key parts of her testimony. He simply relied on his counsel's impeachment of her by attacking her credibility.

Hung's testimony is also bolstered by a number of the other parts of the record. The divorce of Keener and Hung resulted in a finding by the Iowa Supreme Court consistent with Hung's testimony. The Iowa Supreme Court found that Keener and Hung listed their assets in Hung's name to avoid Keener's creditors. In re Marriage of Keener, 728 N.W.2d 188, 191 n.1 (Iowa 2007), opinion amended on denial of reh'g (Mar. 9, 2007) ("Jody and Connie put all of their assets in Connie's name in order to avoid Jody's creditors.").

Keener's undisputed problems with the IRS and the resulting criminal charges are consistent with Hung's testimony. There is no dispute Keener has had a record of improper financial transactions in the past. While Keener points out, correctly, that much of this is from the more distant past, the record also contains much evidence from the more immediate past.

8

Keener has provided numerous financial statements in various forms to various parties in the years and months before the bankruptcy proceedings.  A very large number of these financial statements, disclosures of debt, and disclosures of his assets and liabilities were dramatically different.  A number of these financial statements and disclosures were made in close proximity of each other and showed discrepancies of several hundreds of thousands of dollars to multiple millions of dollars.  For example, on a personal financial statement dated July 31, 2012, Keener reports that he held a note receivable from Alpha for $740,009.  But an Alpha balance sheet also dated July 31, 2012 showed notes payable to Keener totaling $9,748,304.13.  This was a discrepancy of over $9 million.  Moreover, in answering a July 30, 2012 interrogatory that sought to garnish against his salary from Alpha, Keener—signing on behalf of Alpha—stated that Alpha did not owe any money or property to Keener.

Keener signed a similar interrogatory on behalf of J. K. Manufacturing where he indicated that J. K. Manufacturing did not owe any money or property to him.  This interrogatory was also dated July 30, 2012.  But his July 31, 2012 personal financial statement showed a note receivable from J. K. Manufacturing for $641,718.  These kinds of discrepancies are summarized in Super Wings closing argument.  The Court hereby adopts and incorporates in its findings the

detail of the discrepancies in financial statements provided by Super Wings in its

closing argument and accompanying exhibit.

Keener's plan of reorganization also relies on significant sales of real estate

and equipment and inventory from toy companies.  Keener has listed his intention

to sell several parcels of residential real estate over time and to use the proceeds to

fund the plan.  Keener has provided, however, only a listing of the projected real

estate sales values.  Keener offered no documentation to support those values.  He

had no appraiser and offered no appraisals.  After the confirmation hearing, Keener

has attempted to introduce a listing of real estate prices determined by realtors after

a market analysis.  No testimony was offered to support these documents.  The

Court specifically stated at closing argument that the record was closed and denied

Keener's request to reopen the record to produce this documentation.  The record

on confirmation contains no evidence to support the value assertions in the plan.

The plan also purports to rely on even projected revenue from sales of

equipment from Keener's toy companies.  In particular, the sales projections

appear to largely rely on toy inventory and equipment (molds and related toy

making materials) held by Alpha.  However, it remains unclear to the Court

whether the inventory and/or equipment holdings of other Keener toy companies

will be part of those sales.  If so, there is no explanation of what would be sold,

10

when it would be sold, and to whom.  If not, there is no explanation why these other resources would not be used.

Moreover, this plan provision on sales of toy inventory and equipment relies entirely on the testimony and analysis of Keener about how the sales would occur, what would be sold, and the values that could be realized.  The Court finds that Keener's testimony is insufficient to support any specific value that would be realized, or when it would be realized for the benefit of creditors under the plan. The testimony simply seeks to have the Court and creditors trust Keener that he will sell the right things, at the right time, at the right place.

The Court acknowledges that Keener has many years of experience in the toy industry.  The Court further notes that Keener's companies appear to have a good deal of inventory and/or toy making equipment.  Keener introduced a number of lists of that inventory and/or equipment.  Keener provided his view of the values attributable to those assets.  But that is where it ended.  He identified no specific groups of items to be sold at specific times.  He identified no buyers or even interested parties.  His accountants' testimony about the sale of the inventory and equipment entirely deferred to Keener's predictions and his past results.  Keener simply asks the Court and creditors to rely on the fact that he has had success in the past in making money in the toy industry.  The gist of his evidence is the Court and

creditors should simply believe his estimation of what he may be able to make to fund the plan.

Keener's testimony is not enough, standing alone.  He provides no particular timetable for the sale of the inventory and/or equipment.  He provides no information about buyers in the industry.  He only notes that sales should be made at the appropriate time and in the appropriate amounts as dictated by the market. Like the real estate sales Keener projects, there is no specific buyer listed or tentative agreement offered to support the projected revenue.  Thus, there is no evidence of feasibility and likelihood of payments from sales flowing to creditors.

The Court does not find Keener's testimony totally lacking in credibility. The Court finds his testimony about two particular sources to fund the plan to be credible and useful.  Keener's testimony about the salary he will receive from Alpha, and the base amounts he will receive from intellectual property rights on the "Big Wheels" contract to be reliable and verified by the record.  Both of those sources will provide real and reliable income upon which projections can be based. Keener also appears to also have other valuable intellectual property rights on "known" toy brands that could fund his obligations to creditors.  However, there is insufficient evidence in the current record to support specific values upon which projections for performance of the plan can be based.

The IRS recently conducted an audit of Keener and J. Lloyd for tax years 2012 and 2013 that undermines Keener's financial trustworthiness. That audit resulted in a finding of underpayment and an adjustment in his tax liability. Keener and his accountant explain this as basically a mistake on the part of the IRS. They claim it was simply not cost effective to fight the mistake and the adjustment amounted to nothing more than a prepayment of his future tax liability. Neither Keener nor his accountant however attempted to explain statements in the audit documents finding that Keener and his J. K. Properties are "likely" engaging in "a self-serving ploy to protect assets" by way of a default judgment Keener received against J. K. Properties. Ex. EEEE at 38. The audit also questions Keener's financial practices with his companies generally.

Keener offered testimony from a number of bankers and other long-time participants in the toy industry. These business people have dealt with Keener positively over the years. He offered this testimony to show that he is trustworthy and reliable. The Court does not doubt that Keener had positive dealings with them over the years. None of that testimony, standing alone or viewed as a whole, overcomes the serious concerns raised by the documented deficiencies in his various financial statements in the past. In short, the Court believes that, at best, this evidence shows that Keener is reliable in dealing with the parties and persons that he wants to pay or do business with.

13

The Court also finds that Keener has provided a list of assets—real estate, equipment, intellectual property contracts, and toy inventory—that appear to have real value and offer a <u>potential</u> for distribution to creditors. There is not, however, evidence those assets will be available to provide the necessary projected revenue to fund Keener's proposed plan of reorganization.

Keener's accountant, who prepared the projects Keener's plan relies on specifically, noted he and his firm relied on information Keener provided to them. They specifically stated they used Keener's "quick books." They noted Keener had full control over directing payments, transferring assets, and taking distributions from his companies. Neither the accountants nor any other witnesses, however, demonstrated that Keener would be restricted from moving assets around between the companies—which are not in bankruptcy—or that Keener's discretion to sell or transfer assets as he saw fit was otherwise curtailed. One of his accountants noted that Keener had routinely moved money in and out of companies, and between them, as cash flow needs dictated. There is nothing in the current record that to assure that the money or assets described in Alpha as being available to fund the plan, would not be transferred around or between companies during the plan period to thwart Super Wings' ability to get "full payment" under the plan.

**CONCLUSIONS OF LAW**

The three issues before the Court are: (1) plan confirmation[1]; (2) Super

Wings' motion convert the case to Chapter 7; and (3) Super Wings' alternative

motion to appoint a Trustee.  The Court will consider each of these issues in turn.

## I.      CONFIRMATION

"In order to confirm a Chapter 11 reorganization plan, the plan must satisfy

all sixteen requirements of 11 U.S.C. § 1129(a)."  In re Civic Partners Sioux City,

LLC, No. BR 11-00829, 2013 WL 5534743, at *15 (Bankr. N.D. Iowa Oct. 7,

2013) (citing In re Riverbend Leasing LLC, 458 B.R. 520, 525–26 (Bankr. S.D.

Iowa 2011)).  One of these requirements is that every class of claims or interests

has either accepted the plan or is not impaired under the plan.  11

U.S.C. § 1129(a)(8) (2012).

Here, Super Wings has rejected the plan and is impaired under the plan.  As

a result, § 1129(a)(8) is not satisfied.  Even so, § 1129(b) permits confirmation, but

sets forth a different set of requirements that must be satisfied.  11 U.S.C.

§ 1129(a)–(b).  The Court has previously discussed § 1129(b)'s requirements:

> Section 1129(b)(1) provides for confirmation over creditor's
> objections if "the plan does not discriminate unfairly, and is fair and
> equitable" with regard to those creditors.  Id. § 1129(b)(1).  Such
> plans are "referred to as cram down plans because they have been

---

[1] Because the Court finds that Keener has not met his burden of proof with
respect to confirmation, the Court need not rule on the adequacy of the disclosure
statement.

'crammed down the throats of objecting creditors.'"  <u>River Rd. Hotel
Partners, LLC v. Amalgamated Bank</u>, 651 F.3d 642, 647 (7th Cir.
2001) (quoting <u>Kham & Nate's Shoes No. 2, Inc. v. First Bank</u>, 908
F.2d 1351, 1359 (7th Cir. 1990)); <u>see also</u> <u>In re Windsor on the River</u>,
7 F.3d 127, 131 (8th Cir. 1993) (refers to such plans "being 'crammed
down' the throat of second lenders").

"The proponent of the plan bears the burden of proof with respect to
each element of §§ 1129(a) and 1129(b) under a preponderance of the
evidence standard."  <u>In re Internet Navigator Inc.</u>, 289 B.R. 128, 129
(Bankr. N.D. Iowa 2003) (citation omitted).

<u>In re Civic Partners Sioux City, LLC</u>, 2013 WL 5534743, at *15.  Because

§ 1129(a)(8) is not satisfied here, Keener must—in addition to the other § 1129(a)

requirements—show that the plan does not discriminate unfairly against, and is fair

and equitable to Super Wings under § 1129(a).

Even in a cramdown, if the debtor fails to prove even one requirement of

§ 1129(a)—other than (a)(8)— then the plan cannot be confirmed.  One of those

requirements is found in §  1129(a)(11) permitting confirmation only if:

Confirmation of the plan is not likely to be followed by the
liquidation, or the need for further financial reorganization, of the
debtor or any successor to the debtor under the plan, unless such
liquidation or reorganization is proposed in the plan.

<u>11 U.S.C.</u> § 1129(a)(11).  This is commonly referred to as the "feasibility"

requirement.  <u>Prudential Insurs. Co. of Am. v. Monnier</u> (<u>In re Monnier Bros.</u>), 755

F.2d 1336, 1340 (8th Cir. 1985).  Creditors cannot waive or consent to the

feasibility requirement.  <u>See</u> <u>In re Las Vegas Monorail Co.</u>, 462 B.R. 795, 798

(Bankr. D. Nev. 2011).  "[T]he bankruptcy court has an obligation to scrutinize the

plan carefully to determine whether it offers a reasonable prospect of success and

is workable." In re Gilbertson Rests. LLC, No. 04–00385, 2005 WL 783063, at *5

(Bankr. N.D. Iowa Apr. 4, 2005).

The Court has previously discussed § 1129(a)(11)'s feasibility requirement,

and the standards the Court applies when considering feasibility, in detail:

> To determine the feasibility of a plan, the court must ascertain
> the probability of actual performance of the provisions of the
> plan.  In re Mosbrucker, 227 B.R. 434, 437 (B.A.P. 8th Cir.
> 1998), aff'd,198 F.3d 250 (8th Cir. 1999).   Feasibility of a
> Debtor's plan is a factual determination.  Id.
>
>> This feasibility standard requires the Court to determine
>> whether the plan offers a reasonable prospect of success
>> and is workable.   In re Monnier Bros., 755 F.2d 1336,
>> 1341 (8th Cir. 1985).   The test is whether the things
>> which are to be done after confirmation can be done as a
>> practical matter under the facts.   In re Clarkson, 767 F.2d
>> 417, 420 (8th Cir. 1985).
>>
>> The Eighth Circuit's feasibility test considers whether
>> provisions in a plan are achievable given the unique facts
>> of the case.   In re Bowman, 253 B.R. 233, 238–39
>> (B.A.P. 8th Cir. 2000).   This Court will only approve a
>> plan if it has a rational likelihood of success.   In re Danny
>> Thomas Prop. II Ltd. P'ship, 241 F.3d 959, 963 (8th Cir.
>> 2001).
>
> In re Puff, No. 10–01877, 2012 WL 994007, at *5–6 (Bankr.
> N.D. Iowa Mar. 23, 2012) (citing In re Richards, No. 03–02487,
> 2004 WL 764526, at *2–3 (Bankr. N.D. Iowa Apr. 2, 2004)).
> "This [feasibility] test is meant to prevent confirmation of plans
> based on speculation."  Riverbend Leasing, 450 B.R. at 531–32
> (emphasis added).

17

> In re Civic Partners Sioux City, LLC, No. 11–00829, 2013 WL
> 5534743, at *15–16 (Bankr. N.D. Iowa Oct. 7, 2013).  As Chief Judge
> Shodeen pointed out in Riverbend Leasing, "the success of a debtor's
> proposed plan need not be guaranteed, but a bankruptcy court cannot
> approve a plan unless there is at least a reasonable likelihood of
> success."   Riverbend Leasing, 458 B.R. at 531 (quoted sources
> omitted) (internal quotation marks omitted).   Numerous courts in
> addition to Riverbend Leasing have cautioned against the use of
> speculative projections to support feasibility.  See In re Indianapolis
> Downs, LLC, 486 B.R. 286, 298 (Bankr. D. Del. 2013) (noting "the
> purpose of the feasibility test is to protect against visionary or
> speculative plans"); In re Las Vegas Monorail Co., 462 B.R. 795, 802
> (Bankr. D. Nev. 2011) (cautioning the reliance on multiple speculative
> future events to establish feasibility). Another court has stated it this
> way: "A court should consider 'concrete' and not 'speculative'
> projections of a business."   In re Geijsel, 480 B.R. 238, 257–58
> (Bankr. N.D. Tex. 2012).

In re Plymouth Oil Co., LLC, No. BR 12-01403, 2013 WL 5786458, at *7 (Bankr.

N.D. Iowa Oct. 28, 2013).

"Feasibility determinations must be 'firmly rooted in predictions based on

objective fact.'"  In re Danny Thomas Properties II Ltd. P'ship, 241 F.3d 959, 964

(8th Cir. 2001) (quoting In re Clarkson, 767 F.2d 417, 420 (8th Cir. 1985)).

"Feasibility is the heart of every Chapter 11 reorganization case.  It is the most

important element of § 1129(a)."  In re Seasons Partners, LLC, 439 B.R. 505, 514

(Bankr. D. Ariz. 2010) order confirmed, No. 4:09-BK-24017-JMM, 2010 WL

6556774 (Bankr. D. Ariz. Nov. 8, 2010).

Here, Keener offers projections to support the plan based on financial

information from himself or his accountants.  These projections rely on the support

18

of and continued performance by many of his companies that are not a party to this case. Those companies are wholly owned by and under control of Keener. The projections specifically rely on payments Keener would make to creditors out of his salary from Alpha. The projections rely on distributions Keener would receive from contracts held by Alpha. The projections rely on net sale proceeds of molds and tooling from Alpha and other companies. The projections also rely on the proceeds of the sale of real estate (currently held by Keener individually) at unspecified times and in speculative amounts. The projections purport to show how Keener will make plan payments from several sources, and how likely those payments are to actually occur.

The Court finds that the projections supporting Keener's plan are not "concrete . . . projections" nor are they "firmly rooted predictions based on objective fact." The Court bases this finding on reasons that fall into three main categories: (a) The financial data that the plan relies on has been reported in an inconsistent and unreliable manner; (b) Keener has a history of structuring his company ownership in a way to avoid paying creditors and being accountable to them; and (c) Keener fails to provide sufficient evidence of the value of property he plans to sell to finance the Plan and provide security to Super Wings. These categories are addressed in the following pages.

19

### a. Inconsistent Financial Statements

Super Wings pointed out a number of large and serious inconsistencies between different versions of Keener's own personal financial statements that were presented to different parties at similar points in time.  Those personal financials were also often inconsistent with how he represented his companies' finances.  These financial discrepancies are troubling.  Keener's projections are based and rely on the accuracy of his finances.  His finances, in turn, rely on the accuracy of his companies' finances.  The inconsistent and inaccurate statements have not been adequately explained.  The Court cannot find a plan to be feasible if it relies on numbers that cannot be trusted, or verified with some degree of certainty.

The inconsistent reports also indicate that Keener appears to see little distinction between his finances and that of his companies.  This is a serious problem here because the companies are not parties to the case.  And although Keener filed a modified plan that would bind his companies to fulfil his obligations under the plan in the event of default, that modification was not on file at the confirmation hearing.  The Court heard no evidence to support this modification.  Consequently, creditors did not have the opportunity to examine witnesses about this modification, how it would work, and how it could be enforced, or any other aspect of it.

Keener argues that his plan is not based on these past financial statements and any discrepancies are thus irrelevant to the feasibility of the plan.  Keener points to the testimony of his accountants to support this assertion.  He believes the accountants personally presented the details of the plan while demonstrating the certainty of the financial projections reflected on that plan.  The Court notes that the accountants testified that all financials he prepared for this case and on other occasions were based on documents and information that Keener  provided to them.  Moreover, the accountants never addressed the inconsistencies of the various financial statements at all in testimony.  These inconsistencies were simply left unrebutted.

Keener also seeks to minimize the discrepancies in the financial statements by pointing to testimony from his lenders and bankers.  They all testified that they did not look at the financial statements that Keener provided to them in any detail. They essentially noted that they all got paid, and did not look closely at the file as long as their loans were getting paid.  None of this testimony shows Keener's financial discrepancies and inconsistencies are irrelevant or excused.  The conflicting financial statements simply did not harm those that Keener chose to pay.  This does not show that Keener's statements are accurate, believable, or supportive of his projected finances in the future.  This is particularly a concern for

a creditor like Super Wings, with which he has a bad relationship with and has

made no effort to pay in the past.

Perhaps most importantly for feasibility, these financial questions and

discrepancies generate a great deal of doubt about the true financial condition of

Keener and his companies.  Keener's financial condition on paper appears to have

fluctuated with his needs at any given time.  No one has challenged his numbers

until recently.  No creditor has examined his practice of moving assets between

himself and his companies and whether that could affect his ability to perform as

set out in the plan.

### b.  History of Avoiding Creditors

The funding of Keener's obligations is a serious concern here because he has

previously used his companies to shield his assets.   He and his accountant further

testified that Keener owned and controlled all of his companies completely.  They

both noted he routinely transferred money between the companies—and his

personal money was often tied up in company finances, inventory, or other

sources.   This has led to Keener being able to declare that he is unable to pay his

debt to Super Wings, while his financial statements showed vast sums were tied up

in his wholly owned businesses.

Super Wings' claim is based on a judgment they received against Keener in

January 2012.  Super Wings sued Keener on a promissory note and was awarded a

$2 million judgment at 9% interest against Keener in the Northern District of Iowa in January 2012. <u>Super Wings Int'l, Ltd. v. Keener</u>, No. C09-0115, 2012 WL 252638 at *13 (N.D. Iowa Jan. 25, 2012) <u>aff'd sub nom.</u> <u>Super Wings Int'l, Ltd. v. J. Lloyd Int'l, Inc.</u>, 701 F.3d 870 (8th Cir. 2012).

In a 2013 filing in the District Court for the Northern District of Iowa, Keener swore that he was "unable to pay" Super Wings' judgment in full. Keener argues that this is a truthful statement, because his assets were tied up in his companies. This coincided with incredible fluctuation in Keener's reported net worth in the years before bankruptcy: He reported a net worth of nearly $90 million in late 2010; roughly $450,000 in 2012; $57 million in 2013 and $34 million in 2014. Super Wings argues that the fact that the low points in Keener's reported net worth coincide with the entry of their judgment cannot possibly be a coincidence. These discrepancies were not explained sufficiently, leaving the Court with little reason to find that the numbers Keener provides now are reliable.

Additionally, the IRS recently conducted an audit of Keener and his companies. That audit resulted in a report that contained the following findings:

> The amount and frequency of loans reported is excessive to that which could have been an oversight and requires the active reporting to the preparer in order to be reflected on the return. TP's 30+ years of . . . business experience, interaction with the IRS and court room experience . . . preclude him from claiming a lack of knowledge or sophistication. The basis adjustment is the result of either, negligence, willful disregard or fraud.

Ex. EEEE at 39.  This conclusion is troubling and shows the need for further

evidence on Keener and his companies' financial reporting and

transparency.

This is not, however, the first time there has been a doubt raised about

his finances and his candor.  In 2007, the Iowa Supreme Court made a

specific and unequivocal statement in reviewing his divorce from Connie

Hung that "Jody and Connie put all of their assets in Connie's name in order

to avoid Jody's creditors."  In re Marriage of Keener, 728 N.W.2d 188, 192

(Iowa 2007), opinion amended on denial of reh'g (Mar. 9, 2007).

Hung testified at the confirmation hearing that she worked with Keener in

the toy industry during their marriage.  She noted that Keener put everything in her

name, even though he made all of the decisions about the business.  She also

testified that Keener also operated a "side business" of selling gold and

diamonds—that they never reported.  She also testified that Keener would

routinely carried tens of thousands of dollars in cash to carry out these transactions.

Keener argues that her testimony is not credible because she admitted to

avoiding creditors herself and also to making fraudulent transfers before her own

bankruptcy.  The Court disagrees with Keener's argument.  Hung's testimony was

unflattering to both Keener and herself.  Hung admitted to wrongdoing—in those

transactions and others.  While Keener attacked her credibility for these

wrongdoings, he did not contradict any of her testimony.  In fact, Keener did not

address at all the Iowa Supreme Court statement that is entirely consistent with and

supportive of Hung's testimony.  The Court finds Ms. Hung's testimony to be

believable on the key issues before this Court.

     The Court acknowledges that Hung's testimony did not address Keener's

business dealings since their divorce.  Nevertheless, the Court finds her testimony

about Keener's pattern of dealings during their divorce to further indicate that—at

an absolute minimum—Keener needs to provide much more verifiable information

about his finances than he has offered.

     Keener's history of hiding assets from creditors alone could be fatal to

confirmation.  This history combined with the IRS auditor's stated concerns about

Keener's present financial dealings only amplifies the discrepancies in his personal

and company financial statements.  These financials, and Keener's history of

avoiding his creditors, seriously undermines the reliability and believability of the

"projections" he offers to support his plan.  At a minimum, they need further

explanation.  They may warrant more, including the appointment of an examiner—

discussed below.

### c.  Evidence of Real Estate Values and Inventory Values

     Keener's projected income from salary and distributions from his companies

was only a part of the projected pay-out to creditors.  Much of the additional cash

is projected to come from the sale of personal real estate and inventory and

equipment from his companies.  Keener's projection of sale revenue, however, is

not supported by the record.

Keener offered no valuation analysis of the real estate at the confirmation

hearing.  Keener did file "valuations" along with a post-confirmation amendment

to his plan one week after closing argument.[2]  Super Wings has moved to strike

these filings, correctly noting that the valuations were not offered or admitted at

the confirmation hearing.  As the Court noted at final argument, the record is

closed.  Moreover, these "valuations" cannot be admitted in a vacuum and support

plan confirmation.  These "valuations" are not appraisals, are not prepared by

certified appraisers, and are not even supported by testimony to establish a

foundation for them.

Even if the Court were to consider these "valuations," however, they have

little persuasive value.  They do not constitute the type of "concrete projections" or

---

[2] Keener also asked the Court at the end of closing argument to reopen the
record to take further evidence on value.  The Court declined to reopen the record.
Nevertheless, one week after closing argument, Keener filed what he captioned as
his Non-Material Second Amendment to the plan and exhibits supporting valuation
of the real estate to be sold under the plan.  Super Wings moved to strike both of
these filing along with the late filed ballot summary.  The Court grants Super
Wings Motion to Strike with respect to the untimely filed exhibits.  The record is
closed and the valuation exhibits are untimely.  They are also inadmissible for lack
of foundation.  Because the Court is denying confirmation of Keener's plan, the
motion to strike with respect to the modified plan and ballot summary are moot.

"firmly rooted in predictions based on objective fact" need to support a plan. They

are valuations provided by a real estate broker based on other listings. Other

Courts have found estimates of value made by a real estate broker to be less

persuasive than those made by appraisers:

> I do not share the view that the opinion of value by a licensed real
> estate broker should be afforded the same evidentiary weight as that
> rendered by a licensed appraiser. At the outset, an assessment of the
> fair market value of a real estate parcel by an appraiser carries greater
> weight than that of a real estate broker who does not have the same
> rigorous, specialized training. While a broker relies upon his sales
> experience, a broker is not instructed in his or her valuation opinion
> by the industry standards and uniform guidelines to which a
> competent appraiser must adhere in preparing an appraisal and
> rendering an opinion of value.

In re Pichardo, No. 12-13015, 2013 WL 1352308, at *4 (Bankr. D.R.I. Apr. 3,

2013). A real estate broker's "lack of appraisal training and limited experience as

an appraiser clearly affect[s] the weight accorded to his testimony." Id. (quoting In

re Smith, 267 B.R. 568, 575 (Bankr. S.D. Ohio 2001) (alterations in original). At

least one court has gone so far as to exclude the testimony of real estate brokers on

valuation: "Real estate brokers and agents without specialized training in real

estate appraising are not qualified to testify as to their opinions regarding market

value." See Donaway v. Tucker (In re Donoway), 139 B.R. 156, 158 (Bankr. D.

Md. 1992). This Court does not go so far, but does agree that

> [t]he evidence offered by the Debtor in support of the value is
> somewhat weak. The Debtor is competent to testify as to the value of
> his own property, although the weight of that testimony is undercut by

> the obvious interest he has in keeping the value low. The market
> evaluation analysis is conducted by a realtor rather than an appraiser,
> and while that is also competent evidence as to value, it does not carry
> the weight of a valuation by a qualified appraiser.

In re Moffitt, No. BKR 09-17079, 2009 WL 5216974, at *1 (Bankr. D.N.J. Dec.

30, 2009).

Here, the plan's full payment of Super Wing's claim requires the planned

sale of real estate and equipment. The current plan's specified $25,000 quarterly

payment from Keener's salary only adds up to a partial interest-only payment. The

plan relies on the sales it describes to pay the remainder—the principal of Super

Wings' claim. Super Wings' principal payments are thus contingent on the

successful sale of real estate and other assets at the planned values at the planned

times. The Court finds that the "valuations" that Keener provides for the real

estate are insufficient on their own. They are not a reliable basis to establish the

value likely to be realized by a sale.

The plan also proposes to sell toy molds and tooling from his toy companies.

Keener provided no evidence—apart from a list of assets with asserted values next

to it to establish the projected sale price of these molds and tooling. Keener did

testify summarily to the listed values based on his own experience in the industry.

Keener's summary testimony that the values stated in the plan are the likely sale

values is not a "concrete . . . projection" or "firmly rooted prediction based on

28

objective fact."  More evidence is needed to establish the value that the molds and tooling are likely to bring from sale.

Where a plan will be funded by selling real estate, stock, or other property, plan proponents must provide more than a mere intent to sell: "It has been held in a Chapter 11 case that a bare proposal to pay upon the sale of property does not satisfy the feasibility requirement of § 1129(a)(11) as a matter of law."  In re Hungerford, No. 00-31671-13, 2001 WL 36211305, at *8 (Bankr. D. Mont. Mar. 22, 2001) (citing In re Thomas, 241 F.3d 959, 964-65 (8th Cir. 2001)); see also In re Bassett, 413 B.R. 778, 788 (Bankr. D. Mont.  2009) (also applying Thomas to the feasibility of bare proposals to sell property in the Chapter 13 context).  One court described why more than a mere intent to sell is needed to satisfy the feasibility requirement:

> The Debtors propose to satisfy the claim of the Federal Land Bank through a sale of certain parcels of real estate.  The Debtors' Plan requires that the real estate be sold and the proceeds paid to Federal Land Bank within a period of two years.  There is no assurance, however, that a sale of the real estate will be completed within the two-year period, and there is no provision in the Plan of Reorganization for treatment of the Federal Land Bank claim in the event there is no sale of the real estate.  Plan modification or further financial reorganization would be necessary at the end of the two-year period if the claim of Federal Land Bank is not satisfied.  Feasibility as noted in the case of In re Bergman, 585 F.2d 1171 (2nd Cir. 1978), contemplates "the probability of actual performance of the provisions of the plan.  Sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are visionary promises.  The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts."  In this regard, the Court is

29

not satisfied that the proposed sale of the real estate as contemplated is sufficiently concrete to assure either consummation within the two years or that even if sold within the two-year period the price obtained would be sufficient to pay the principal balance and accrued interest owing to Federal Land Bank.  The Court must conclude that the requirement of 11 U.S.C. § 1129(a)(11) has not been met in this instance.

In re Hoffman, 52 B.R. 212, 215 (Bankr. D.N.D. 1985).  Another bankruptcy court

provided a similar analysis:

> The Amended Plan, even as conditioned, provides no basis upon which to conclude that it is feasible within the meaning of 11 U.S.C. § 1129(a)(11).  Without knowing the terms of the proposed sales of Midlothian Farm and the Portsmouth Blvd./Gum Road property, and without knowing the specific timeframe for the proposed sale, and without articulation of a schedule and a plan for the liquidation of other properties in the event that the sale of the Midlothian Farm and the Portsmouth Blvd./Gum Road property fails to yield sufficient funding, it is impossible for a court to find that there will be no need for further financial reorganization or indeed liquidation of the Bankruptcy Estate.  Thus, on the record before it, the Bankruptcy Court lacked a legally sufficient basis to conclude that the Amended Plan will satisfy the feasibility requirement and it erred in confirming the Amended Plan without requiring the Walkers to satisfy the feasibility requirement.

In re Walker, 165 B.R. 994, 1005 (E.D. Va. 1994).

In sum, "plans of reorganization which fail to provide specific details for the sale of real estate, (including the date by which the sale must occur) or to identify the potential purchaser and the expected price do not satisfy the adequate means of implementation requirement of the Code thereby precluding confirmation."  Id. at 1003.  One Court even found that such deficiencies in a plan constituted bad faith:

Debtor's chapter 11 plan, therefore, boils down to nothing more than an announced hope that he will sell his stock by February 6, 1988 for enough to satisfy the debt to the corporation, which was fixed by judgment against him 15 months before that date. He has produced no specific offer of purchase, no specific sale date, and no credible basis to value the stock. He asks this court to hold the corporate creditor at bay another five months from today to see if he can do what he hopes to do, but has failed to do the past ten months.
. . .

I find that the chapter 11 petition has been filed in bad faith.

In re Sutton, 78 B.R. 341, 342 (Bankr. S.D. Fla. 1987). "Courts should not shift the real risk of an asset's value volatility onto a creditor who will be left holding the keys in the event of liquidation." In re Geijsel, 480 B.R. 238, 261 (Bankr. N.D. Tex. 2012).

Keener's failure to provide admissible evidence of the value of the real estate and equipment to be sold to fund the plan payments to Super Wings is a serious deficiency. The fact that the proposed sales are nothing more than Keener's stated intent to sell property in the future is another serious deficiency. Keener has identified no buyers or even evidence of evidence of interest from prospective buyers on any of the property. Keener has not offered sufficient evidence to support the values needed to meet his projections for success. Keener's plan payments to Super Wings hinge on both the proposed sale values and some showing of ability to successfully realize those values. Keener has failed to provide sufficient evidence of the value of property to be sold and a plan for

31

actually selling it.  This is another reason the Court finds that the plan is not

feasible.

In short, Keener has not shown to the Court's satisfaction that he has

abandoned his past history of inaccurate accounting and attempting to avoid paying

creditors he is at odds with.  Keener has also not shown that the real estate

valuations are accurate and reasonable or that sale at the proposed times and values

is likely.  The Court thus denies confirmation of the plan. [3]

## II.    MOTION TO CONVERT TO CHAPTER 7

Super Wings filed a motion to convert this case from Chapter 11 to Chapter

7 for cause under § 1112(b).  Super Wings filed this motion after the Court set the

confirmation hearing.  The Court heard this motion and took supporting evidence

at that hearing.  Super Wings argues that there is cause to convert the case to

---

[3] Denial of confirmation largely meets another issue pending before the Court—Keener's Motion to Compromise and Super Wings' objection thereto.  The Motion to Compromise intended to provide a basis for another provision in the Plan—that Keener would receive JCI's interest in molds JCI owned.  Those molds are in the possession of Super Wings in China.  The plan provision would allow Keener to demand return of those molds for use in generating income for use in repaying creditors.

While that issue is largely moot given the Court's denial of confirmation, the Court will address the merits to avoid such litigation should Keener propose another, different plan in an attempt to comply with this Ruling.  The Court will deny the Motion to Compromise and grant Super Wings a judgment as a matter of law.  In short, Keener failed entirely to produce evidence supporting the Motion to Compromise.  The Court will issue a separate opinion describing the rationale for that decision in greater detail.

Chapter 7 and that the best interests of the estate will be served by converting the

case to Chapter 7.

> Section 1112(b) provides:

>> . . . **on request of a party in interest**, and after notice and a hearing, **the court shall convert a case under this chapter to a case under chapter 7** or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, **for cause** unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112 (b)(1). "Under § 1112(b)(1), the movants have the initial burden

to establish cause for conversion." In re Plymouth Oil Co., L.L.C., No. 12-01403,

2014 WL 3812078, at *2 (Bankr. N.D. Iowa Aug. 1, 2014) (quoting In re Keeley &

Grabanski Land P'ship, 460 B.R. 520, 535 (Bankr. D.N.D. 2011)).

> The undersigned, sitting by designation in another judicial district, has

previously addressed the standards for a motion to convert a case under Chapter 11

to one under Chapter 7.

>> Before the 2005 amendments to the Bankruptcy Code,—widely referred to as BAPCPA—bankruptcy courts had broad discretion under § 1112(b) to convert a case from Chapter 11 to Chapter 7. In re Miell, 419 B.R. 357, 366 (Bankr. N.D. Iowa 2009) (citing In re Hedquist, 450 F.3d 801, 804 (8th Cir. BAP 2006) (applying pre-BAPCPA law)).

>> Following BAPCPA's 2005 amendments to the Bankruptcy Code, section 1112(b)(1) is "no longer permissive, but instead mandates conversion or dismissal if the movant establishes exclusive cause, and no unusual circumstances establish that conversion or dismissal is not in the best interest of creditors." However, "[w]hether cause exists under § 1112(b) and, if so,

33

whether dismissal [or conversion] is appropriate are questions
left to the sound discretion of the bankruptcy court."

. . .

The statutory list of "causes" is not exhaustive.  In re Miell, 419 B.R.
at 366 (citing In re Reagan, 403 B.R. 614, 620 (8th Cir. BAP 2009);
In re DCNC North Carolina I, LLC, 407 B.R. 651, 665 n. 30 (Bankr.
E.D. Pa. 2009)).  "The moving party need not show all the enumerated
items under § 1112(b)(4), even though BAPCPA inserted the word
'and' instead of 'or,' which is likely a scrivener's error."  Id. at 366
(citing In re Products Int'l Co., 395 B.R. 101, 109–110 (Bankr. D.
Ariz. 2008) (collecting cases)).

A court may consider other factors and equitable considerations in
making the decision on conversion.  Id. (citing In re Kerr, 908 F.2d
400, 404 (8th Cir. 1990)).

In re Keeley & Grabanski Land P'ship, 460 B.R. 520, 535-36 (Bankr. D.N.D.

2011).  Although not listed under § 1112 (b)(4), bad faith on the part of a debtor

may also constitute 'cause' under § 1112 (b).  See In re Ryder Farms, Inc., No. 02-

3201-CH, 2002 WL 34553561 (Bankr. S.D. Iowa Dec. 30, 2002).

Super Wings argues that cause for conversion exists under § 1112 (b)(4)(A)

("substantial or continuing loss to or diminution of the estate and the absence of a

reasonable likelihood of rehabilitation"); (b)(4)(B) ("gross mismanagement of the

estate"); and (b)(4)(F) ("unexcused failure to satisfy timely any filing or reporting

requirement established by this title or by any rule applicable to a case under this

chapter").  Super Wings also argues that Keener lacks good faith.  Super Wings

cites the same evidence to support its motion to convert under § 1112(b)(4)(A),

(B), and non-statutory bad faith.  The Court finds that this evidence does not

support a finding that there is cause to convert.

### a. Substantial or Continuing Loss to or Diminution of the Estate and the Absence of a Reasonable Likelihood of Rehabilitation

Super Wings first argues that the estate has experienced substantial or

continuing loss or diminution and that there is no reasonable likelihood of

rehabilitation under § 1112 (b)(4)(A).  Keener argues that he is fully solvent and

that any diminution of the estate's cash that has occurred is not cause for

conversion.  Keener also argues that, even if there has been diminution of the

estate, there is a reasonable likelihood of rehabilitation and so no cause for

conversion.  The Court finds that, any diminution of the estate that has occured is

not enough to warrant conversion.  The Court also finds there is a reasonable

likelihood of rehabilitation.

To show cause under § 1112 (b)(4)(A):

Movants must establish both: (1) a substantial and continuing loss of
or diminution of the estate; and (2) absence of a reasonable likelihood
of rehabilitation to establish "cause" under § 1112(b)(4)(A). However,
if the moving parties establish both of those elements, the exceptions
to mandatory conversion in § 1112(b)(2) do not apply. This is because
one element of the (b)(2) exception is that the cause resulting in
mandatory conversion is "other than under paragraph (4)(A)." Thus, if
movants can establish cause under § 1112(b)(4)(A), the only way
Debtor can avoid conversion is to show "unusual circumstances
specifically identified ... that establish that the requested conversion ...
is not in the best interest of creditors or the estate." 11 U.S.C.
§ 1112(b)(1).

In re Keeley & Grabanski Land P'ship, 460 B.R. 520, 539 (Bankr. D.N.D. 2011).

"Negative cash flow alone can be sufficient cause to dismiss or convert under

§ 1112(b)." In re Miell, 419 B.R. 357, 366 (Bankr. N.D. Iowa 2009) (citing Loop

Corp. v. United States Trustee, 379 F.3d 511, 515–16 (8th Cir. 2004)). "The courts

must evaluate losses on a case-by-case basis.  Small losses over an extended period

of time may be acceptable, whereas large losses in a short period may indicate that

rehabilitation is not likely." In re BH S & B Holdings, LLC, 439 B.R. 342, 347

(Bankr. S.D.N.Y. 2010).

Here, Keener's cash balance has reduced during the bankruptcy.  These

reductions have not been substantial enough to warrant conversion.  The cash

decline has been a small part of Keener's large estate.  It has occurred over time

without any evidence that it was the result of questionable activity or spending.

According to Keener's reports, he has significant assets.  Although the Court has

denied confirmation of the plan, Keener may attempt to confirm his plan again—

the newly modified plan or another version of it.

The Court has noted both at final argument and in the above text that a plan

secured by guarantees from Keener's companies may remedy many of the

deficiencies identified.  Such a plan would certainly provide Super Wings with

additional security to ensure payment and at the same time work to curtail one of

its identified concerns—Keener's transfer of funds in and out of his companies,

36

which could continue to be a means of avoiding payments.  As noted, however,

Keener's second amendment to his third amended plan, filed after confirmation, is

not supported sufficiently by the existing record to make it confirmable now.

But assuming Keener could provide the necessary evidentiary support of his

projections and assertions about his financial condition and that of his companies,

rehabilitation becomes significantly more likely.  After carefully reviewing all of

Super Wings arguments, the Court finds that Super Wings has not shown either

substantial or continuing loss to or diminution of the estate or the absence of a

reasonable likelihood of rehabilitation to show cause under § 1112 (b)(4)(A).

### b.  Gross Mismanagement of the Estate

Super Wings also argues that Keener has grossly mismanaged the estate

under § 1112 (b)(4)(B).  Super Wings argues that conflicting testimony and

documentation from Keener, inaccurate bankruptcy schedules, inconsistent

financials, unauthorized payment of pre-petition debt, and a lack of avoidance

actions is cause for conversion.  Keener argues that Super Wings has failed to

show that he has grossly mismanaged the estate.  The Court finds that Super Wings

has not proven that Keener grossly mismanaged the estate.

"To prove 'gross mismanagement of the estate', the movants must show that

Debtor engage in **gross** mismanagement of the estate **after** the case was filed."  In

re Keeley & Grabanski Land P'ship, 460 B.R. 520, 540 (Bankr. D.N.D. 2011)

(emphasis added).  "The 'gross mismanagement' standard implies 'that every

bankruptcy reorganization involves some degree of mismanagement.'" <u>In re</u>

<u>Walton St. Properties, LLC</u>, No. 5:11-BK-70291, 2011 WL 7179642, at *3 (Bankr.

W.D. Ark. July 1, 2011) (quoting <u>In re Jessen</u>, 82 B.R. 490, 494 (Bankr. S.D. Iowa

1988)).

　　　The Court finds that Super Wings has shown conflicting testimony and

documentation from Keener about his past finances, inaccurate statements on

bankruptcy schedules, and uncertainty about Keener's future. While it is unclear

whether this is mismanagement of the estate at all, it does not show gross

mismanagement of the estate. The inconsistencies in some of the testimony and

past misstatements in financial documents, although troubling, do not

automatically quality as proof of gross mismanagement.

　　　Keener's payment of prepetition secured debt is similarly—in context—not

gross mismanagement.  Keener notes that some of the payments Super Wings

complains about were debts owed by Keener's companies.  They were not

payments by Keener personal or by his estate for his debts.  Keener's payments to

Collins Community Credit Union ("CCCU") and Guaranty Bank were payments

by him but on real estate in which those entities had a security interest.  <u>See Taub</u>

<u>v. Taub</u> (<u>In re Taub</u>), 427 B.R. 208, 224 (Bankr. E.D.N.Y. 2010) (supporting the

debtor in possession's authority to pay creditors in the ordinary course of business

and to preserve the estate). Other payments to CCCU were mortgage payments on the house he lives in. None of these payments constitute gross mismanagement of the estate. There was a reasonable basis for all payments.

Super Wings' argument that Keener's failure to file or pursue any avoidance actions is not gross mismanagement standing on its own. Super Wings has not proven there are valid avoidance actions to pursue. Moreover, there is no evidence or likelihood of success or benefit to the estate. After carefully reviewing all of the arguments, the Court finds that Super Wings did not show that Keener grossly mismanaged the estate.

### c. Failure to File Periodic Operating Reports of Keener's Companies

Super Wings next argues that Keener's failure to file periodic operating reports for each of his companies as required by § 1112 (b)(4)(F) and Rule 2015.3 is cause to convert. Section 1112 states that cause to convert includes:

> unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

11 U.S.C. § 1112(b)(4)(F). Rule 2015.3 states:

> **In a chapter 11 case, the** trustee or **debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity** that is not a publicly traded corporation or a debtor in a case under title 11, and **in which the estate holds a substantial or controlling interest.** The reports shall be prepared as prescribed by the appropriate Official Form, and shall be based upon the most recent information reasonably available to the trustee or debtor in possession.

Fed. R. Bankr. P. 2015.3 (emphasis added).  This obligation to file reports on

companies Keener holds a substantial interest in is in addition to every debtor in

possession's duty to file monthly operating reports on their personal finances.

Keener concedes that, before Super Wings filed its Motion to Convert, he had not

filed any such financial reports for his companies.  Super Wings asserts that

Keener's failure to file these reports is cause to convert under § 1112 (b)(4)(F).

A debtor's habitual failure to file accurate monthly operating reports can be

independent cause warranting conversion or dismissal.  See, e.g., In re Whetten,

473 B.R. 380, 383 (Bankr. D. Colo. 2012) (dismissing Chapter 11 because debtor

failed to file timely and accurate monthly operating reports);  In re Berryhill, 127

B.R. 427, 433 (Bankr. N.D. Ind. 1991) (same); see also Myers v. Myers (In re

Myers), 329 B.R. 358 (B.A.P. 10th Cir. 2005) aff'd, 183 F. App'x 738 (10th Cir.

2006) ("There is no dispute that the Debtor failed to file the critical monthly

reports.  Thus, the Court concludes that the bankruptcy court did not err in

dismissing the petition."); In re Tucker, 411 B.R. 530, 532 (Bankr. S.D. Ga. 2009)

(converting case to chapter 7 where "monthly operating reports [were] incomplete,

misleading, and materially false in some respects"); In re 210 W. Liberty Holdings,

LLC, No. 08-677, 2009 WL 1522047, at *7 (Bankr. N.D.W. Va. May 29, 2009)

("The failure to timely file operating reports in itself constitutes cause to dismiss or

convert a case."); Ronald Kern & Sons v. United States Trustee (In re Ronald Kern

40

& Sons), No. 01-BK-12835K, 2002 WL 1628908, at *1 (W.D.N.Y. June 11, 2002)
(finding that lower court did not abuse its discretion in dismissing Chapter 11
because debtor "filed untimely and unverified financial statements containing
inadequate and/or indecipherable information").

While a Court can convert a case for a failure to file reports, there is
generally a stronger argument for cause to convert only after a debtor violated a
court order or other request to file such reports.  See All Denominational New
Church v. United States Trustee (In re All Denominational New Church), 268 B.R.
536, 537 (B.A.P. 8th Cir. 2001) ("[T]he United States Trustee moved for an order
compelling Debtor to file monthly operating reports.  After notice and a hearing,
the court ordered Debtor to . . . file all monthly operating reports on a timely basis
thereafter.  Debtor failed to file any operating reports as ordered."); In re Whetten,
473 B.R. 380, 383 (Bankr. D. Colo. 2012) ("The UST's office contacted Debtors'
counsel by email and by phone regarding these deficiencies and to request other
necessary information, but received no response for weeks. It was not until . . .
after the UST had filed a certificate of contested matter in regard to this Motion to
Dismiss and nearly one year into these cases, before the Debtors attempted to fully
meet their reporting requirements."); In re Keeley & Grabanski Land P'ship, 460
B.R. at 541–46 ("The Court issued an order . . . directing Debtor to file [the
reports].  It is undisputed that Debtor has failed to comply with the Court order.").

41

Moreover, even when on notice that he must file periodic financial reports on their
companies, a debtor's one-time failure to file such a report is not cause for
conversion.  In re Ford, No. 12-20094, 2013 WL 2456379, at *5 (Bankr. D. Wyo.
June 6, 2013).

Here, Super Wings' motion to convert came before any Court order
compelling the filing of periodic operating reports of Keener's companies under
Rule 2015.3.  No one had even made a request to file them before the Motion to
Convert.  After the motion to convert, Keener filed a periodic financial report for
his companies.  Super Wings, arguing that late filing is insufficient compliance,
seeks conversion.

Although it was, and remains, Keener's duty to file such reports, the Court
declines to convert the case to Chapter 7 on this basis alone.  After careful review
of all the arguments, the Court finds that Keener's failure to file the periodic
operating reports before Super Wings' motion to convert is not cause for
conversion under § 1112 (b)(4)(F).

### d.  Cause Based on Keener's Bad Faith

Super Wings final argument for conversion is that Keener filed this Chapter
11 in bad faith.  See In re Ryder Farms, Inc., No. 02-3201-CH, 2002 WL 34553561
(Bankr. S.D. Iowa Dec. 30, 2002) (Although not listed under § 1112 (b)(4), bad
faith on the part of a debtor may also constitute 'cause' under § 1112 (b)).  Super

Wings argues that conflicting testimony and documentation from Keener, inaccurate bankruptcy schedules, inconsistent financial statements, unauthorized payment of pre-petition debt, and Keener's failure to pursue any avoidance actions shows bad faith.  The Court addressed all of these arguments discussing whether Keener has grossly mismanaged the estate.  The Court reiterates that rationale here.

Judge Hill has thoroughly discussed the law surrounding dismissal for a debtor's bad faith:

> Most courts that have considered the issue have determined that bad faith or the absence of good faith constitutes cause under § 1112.  The terms "good faith" and "bad faith" do not turn on the subjective intent of the debtor.  Rather, the concepts encompass equitable limitations placed on debtors by the courts to insure that their reasons for filing lie within the "legitimate scope of the bankruptcy laws.  The Eighth Circuit does not subscribe to a single test for determining when a case is filed in bad faith.  Rather, it instructs the courts to consider the totality of the circumstances including the court's evaluation of the debtor's financial condition, motives, and the local financial realities.  Courts should also consider whether the debtor concealed assets, has been evasive toward the court and creditors, violated the Bankruptcy Code, or violated court orders.  Evasion includes the failure to provide honest and complete information concerning financial affairs and feigned loss of memory during hearings.  It also includes self-dealing and the filing of frivolous motions in an effort to frustrate creditors.

Id. at *8–9 (citations omitted) (quotation marks omitted).

While Super Wings certainly has raised serious questions about inconsistencies in Debtor's past financial statements these questions do not establish bad faith on the existing record.  As noted above, Keener's counsel asked to reopen the record to explain these inconsistencies.  Although the Court denied

that request, it finds that Keener's willingness to provide further evidence, and

even to amend his plan, in a serious way does negate much of the negative

implications inferred from the past inconsistencies.  After carefully reviewing all

of the parties' arguments, the Court finds that Super Wings has failed to prove on

the existing record that Keener filed, or continues to attempt to reorganize, this

Chapter 11 in bad faith.  The Court thus denies Super Wing's motion to convert.

### III.   MOTION TO APPOINT TRUSTEE

Super Wing's also previously filed a motion to appoint a trustee under

section 1104.  While Super Wings indicated the appointment of a trustee is a

secondary position and one it was not pursuing vigorously, the motion was never

formally withdrawn.  Super Wings argues in the motion that Keener's history of

avoiding creditors, providing testimony that lacks credibility, offering inconsistent

financial statements, having a negative cash flow, engaging in lavish spending

habits, and failing to pursue avoidance actions that would benefit the estate,

support appointing a trustee.  Super Wings also argues that Keener has engaged in

self-dealing and given preferential treatment to, and failed to collect against,

insider creditors.

These arguments are effectively the same argues that Super Wings made

when arguing the Motion to Convert.  The Court finds that while some of these

arguments have merit, they do not meet the high standard for appointing a Chapter

11 trustee.  Super Wings has failed to show the necessary cause to appoint a

trustee.  The Court also finds that appointing a trustee is not in the best interest of

creditors.

> Section 1104 states:
>
> (a) At any time after the commencement of the case but before
> confirmation of a plan, on request of a party in interest or the United
> States trustee, and after notice and a hearing, the court shall order the
> appointment of a trustee--
>
>> (1) for cause, including fraud, dishonesty, incompetence, or
>> gross mismanagement of the affairs of the debtor by current
>> management, either before or after the commencement of the case, or
>> similar cause, but not including the number of holders of securities of
>> the debtor or the amount of assets or liabilities of the debtor; or
>>
>> (2) if such appointment is in the interests of creditors, any
>> equity security holders, and other interests of the estate, without
>> regard to the number of holders of securities of the debtor or the
>> amount of assets or liabilities of the debtor.

11 U.S.C. § 1104.  The Bankruptcy Appellate Panel for the 8th Circuit has

discussed the relevant standards when applying subsection 1104(a).  "The

appointment of a trustee in a Chapter 11 case is an **extraordinary remedy**.  And,

'there is a strong presumption in favor of allowing a chapter 11 debtor-in-

possession to remain in possession.'"  In re Keely and Grabanski Land P'ship, 455

B.R. 153, 162 (B.A.P. 8th Cir. 2011) (footnotes omitted) (citations omitted)

(emphasis added).  The party seeking the appointment of a Chapter 11 trustee bears

the burden of showing cause by preponderance of the evidence.  Id.

> Considerations include the materiality of any misconduct, the debtor-
> in-possession's evenhandedness or lack thereof in dealings with

insiders and affiliated entities in relation to other creditors, the existence of pre-petition voidable preferences or fraudulent conveyances, whether any conflicts of interest on the part of the debtor-in-possession are interfering with its ability to fulfill its fiduciary duties, and whether there has been self-dealing or squandering of estate assets.  If cause is found, the appointment of a trustee is mandatory.

Id. (quoting In re Veblen West Dairy LLP, 434 B.R. 550, 553 (Bankr. D.S.D. 2010)) (quotation marks omitted).  "The bankruptcy court has discretionary authority to determine whether cause exists for the appointment of a trustee under § 1104(a)(1)."  Id.

The appointment of a Chapter 11 trustee under § 1104(a)(2) is also left to the Court's discretion:

The Bankruptcy Court may also appoint an operating trustee under § 1104(a)(2) if that appointment is in the interests of creditors, and equity security holders, and other interests of the estate.  Among the factors courts consider in determining whether to appoint a chapter 11 trustee under § 1104(a)(2) are: (1) the trustworthiness of the debtor; (2) the debtor's past and present performance and prospects for the debtor's reorganization; (3) confidence, or lack thereof, of the business community and creditors in present management; and (4) the benefits derived by appointment of a trustee, balanced  against the costs of appointment.  A Bankruptcy Court has particularly wide discretion to appoint a trustee under the flexible standard of § 1104(a)(2) of the Bankruptcy Code, even when no cause exists under § 1104(a)(1).

Id. (citations and quotation marks omitted).

Here, Super Wings has presented evidence of past misconduct by Keener.

Super Wings has, however, provided no evidence of Keener's misconduct

continuing into the bankruptcy.  Although his history of avoiding creditors is a

serious concern (see the Court's denial of plan confirmation, above) there is no

firm evidence that such conduct has continued or will continue in this case.

Keener's past history is insufficient to warrant appointing a trustee.  Keener's

unclear or apparently contradictory statements on financial statements in the past

are troubling (and provide much of the rationale for denying confirmation).  These

past statements, however, are insufficient at this point to remove Keener entirely

from control of the estate.  Similarly, Keener's alleged failure to pursue avoidable

transfers is still subject to debate about the timing and merits of such action.

Keener is correct that the alleged look-back period for any avoidance actions

depend on whether the Court applies the date of the involuntary or voluntary

petition.  Moreover, Super Wings has failed to present compelling evidence that

there are avoidance actions—that would benefit the estate—that Keener has not

pursued.

Appointing a Chapter 11 Trustee would put a third-party in the place of

overseeing and operating multiple toy companies—all of which are clearly

entangled with Keener.  This would be a costly transition.  Super Wings has not

persuaded the Court that such cost is outweighed by the benefit to the estate and to

creditors.  Moreover, testimony at trial established Keener's knowledge of, and

ability to make money in the toy industry.  Replacing Keener with a Trustee is not

likely to maximize the value of Keener's interests in any of the companies.  Super

Wings fails to show how creditors would benefit from Keener being removed.

Even the value of liquidation of any molds and tooling is likely to be higher if done

by someone with industry knowledge.

Super Wings does show inconsistencies in and unanswered questions about

Keener's relationship with his companies and certain creditors.   The Court is not

persuaded, however, that a Trustee taking over Keener's operation is the best way

to clarify these relationships.

The Court concludes that a better way to achieve clarity and transparency

may be by appointing an examiner under § 1104(c).  The Court suggested the

possibility of appointing an examiner after closing argument.  Neither Keener nor

Super Wings agreed that appointing an examiner would be the best approach—but

provided little rationale for those positions.  After reviewing the statute and

relevant caselaw, the Court finds that it has the authority to appoint an examiner,

whether or not a party requests the appointment of an examiner.  See In re

Cloudeeva, Inc., Bankr. No. 14-24874, 2014 WL 6461514, at *6 (Bankr. D.N.J.

Nov. 18, 2014).  The Court believes the examiner issue and the schedule moving

forward should be discussed at a status conference on this case.

## CONCLUSION

**WHEREFORE**, confirmation of Keener's plan is DENIED, Super Wings' Motion to Convert is DENIED, and Super Wings' Motion to Appoint Trustee is DENIED for the reasons set forth in this opinion.

**FURTHER**, Super Wings Motion to Strike is GRANTED IN PART, with respect to the late-filed exhibits, and DENIED AS MOOT IN PART, with respect to the plan modification and ballot summary.

The Court will set a hearing on whether it should appoint an examiner by separate order.

Dated and Entered: December 21, 2015

**THAD J. COLLINS**
**CHIEF BANKRUPTCY JUDGE**